UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JONATHAN S. OSWALD,

               Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY

               Defendant.
_____

DECISION & ORDER

17-CV-6621P

## PRELIMINARY STATEMENT

Plaintiff Jonathan S. Oswald ("Oswald") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## DISCUSSION

**I.    Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of DIB and supplemental security income if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform his past work; and

(5) if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the

3

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

II. **Oswald's Contentions**

Oswald contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 8-1, 11). He contends that the ALJ erred by rejecting all the medical opinions of record and by relying on his own lay interpretation to make his RFC assessment. (Docket ## 8-1 at 12-16; 11 at 1-4). In addition, Oswald challenges the ALJ's step five findings. (Docket # 8-1 at 16-18). The Commissioner counters that substantial record evidence supports the ALJ's finding that Oswald could perform light work with the additional limitations identified in the RFC and that the ALJ's step five determination was adequately supported by the vocational expert's hearing testimony. (Docket # 10-1 at 14-21).

III. **Analysis**

An individual's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities,

non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

### A. The ALJ's Decision and Oswald's Treatment Records

At step two, the ALJ found that Oswald had the severe impairments of traumatic internal carotid artery dissection, Horner['s] syndrome, vasogenic traumatic headache, orthostatic hypotension, centrally driven fatigue, and generalized anxiety disorder. (Tr. 14). The ALJ thereafter concluded that Oswald had the RFC to perform light work except that:

> he can only occasionally climb stairs, balance, stoop, kneel, crouch and crawl[;] [h]e can never climb ladders or similar devices or work in hazardous environments such as at heights or around dangerous machinery[;] [h]e cannot work in exposure to high levels of vibration or loud noise levels[;] [h]e can read and drive normally, but needs to avoid environments with bright lights[;] [h]e can perform routine and repetitive tasks[;] [h]e cannot perform tasks with a strong production pace element or quality.

(Tr. 16).

In explaining his RFC finding, the ALJ summarized the record evidence, including treatment records. (Tr. 17-23). As the ALJ acknowledged, the record evidence established that Oswald experienced a sudden and serious medical event at work on July 17, 2014, for which he received ongoing treatment and remained out of work. (*Id.*). While he was welding and pounding plates together, he suddenly experienced left eye pain, followed by blurriness and headache. (*Id.*; *see also* Tr. 246-69). The next day he went to the Rochester General Hospital Emergency Department because of continued headache, dizziness, blurry vision, photophobia, and a constricted left pupil (which measured smaller than the right). (Tr. 246-69). A head and neck CT scan was performed that revealed "[d]issection of the left internal carotid artery just above the left carotid bulb with reconstitution at the level of the

5

[p]etr[o]us portion of the left internal carotid." (Tr. 249). Oswald was placed on a heparin drip "due to the modified stroke." (*Id.*). He was examined and evaluated by a neurologist, Lawrence Samkoff ("Samkoff"), MD, who assessed Oswald with "[l]eft ICA dissection, with long-segment left ICA occlusion (then reconstitution distally at cavernous portion) likely related to work-related trauma, with left Horner's [syndrome] but otherwise minimal left hemispheric findings on exam and no infarcts on brain MRI." (Tr. 263). Samkoff prescribed a three-to-six month course of treatment with anticoagulants and close neurological observation; his notes reflect "[a]ctivity as tolerated." (*Id.*). Samkoff evaluated Oswald the next day, noting that Oswald "still has left-sided headache/neck pain, for which he is receiving dilaudid," and continued him on a heparin drip with plans to transition to "therapeutic warfarin." (Tr. 265-67).

Oswald remained hospitalized for the next nine days. (Tr. 245-69, 337-41). Upon his release, he began treating regularly with a variety of physicians and specialists, including neurologists, internists, physiatrists, ophthalmologists, and occupational therapists. Oswald's extensive treatment notes from the two-year period between the carotid artery dissection and the ALJ's decision are part of the record. (Tr. 270-419, 434-37, 448-72, 476-581).

Oswald's documented treatment includes records of monthly evaluations and treatment by medical providers at New York Physical Medicine Center (the "Center"), principally physiatrist Matthew Grier ("Grier"), DO, during the period August 2014 through October 2016. (Tr. 272-418, 434-37, 476-548). At Oswald's first appointment with Dr. Grier after the dissection, he complained of frequent headache and left eye pain. (Tr. 403-405). Grier diagnosed him with traumatic left ICA dissection, Horner's syndrome, vasogenic traumatic headache, and centrally driven fatigue – diagnoses that remained unchanged throughout

6

Oswald's period of treatment at the Center. (Tr. 272-418, 434-37, 476-548). Grier referred Oswald for evaluation by specialists in neurology, neuro-ophthalmology, vascular surgery, and occupational therapy. (Tr. 403-405). Throughout Oswald's treatment, he complained of persistent headache, often noting his headaches were daily, with associated, sometimes severe, pain; fatigue, which he noted in March 2015 caused him to need to take midday naps; stress, which he noted aggravated his other symptoms; dizziness; photosensitivity; and anxiety. (Tr. 272-418, 434-37, 476-548). In April 2015, Grier also diagnosed Oswald with orthostatic hypotension and referred him to a cardiologist. (Tr. 292-95). During many of his appointments, abnormal physical examination findings were noted, often with his left eye and tongue. (Tr. 272-75, 276-80, 285-87, 309-12, 435-37, 403-405). He remained out of full-time work during this period. Treatment records from the Center note that for much of the period, clearances were pending approval from other specialists. (Tr. 222-402, 478-79).

In June 2015, Oswald participated in four two-hour sessions of a "work hardening" program, but was taken out of the program and did not complete it. (Tr. 296-307). His notes from the program reflect that he experienced increased fatigue and stronger headaches as the program progressed. (Tr. 300-307). A treatment note from June 25, 2015, records that the program was "on hold as not much improvement." (Tr. 387; *see also* Tr. 399-402). Subsequent treatment notes reflect that he stopped participating in the program "due to concerns over the integrity of the internal carotid . . . [pending further] clearances" (Tr. 478) and "due to [headache] and fatigue" (Tr. 516). Oswald was referred to a neurologist to evaluate his headaches and was also treated with Botox. (*Id.*; *see also* Tr. 285-87, 516-18).

Treatment notes from Oliver Masaba ("Masaba"), MD, another physician at the Center, in October 2016 – over a year later – reflect that Oswald continued to complain of daily

7

headaches, dizziness, fatigue, and photosensitivity. (Tr. 435-37). Masaba's notes reflect that Oswald was working at an internship doing data entry computer work, but experienced vertigo with side-to-side rotation of his head, which interfered with his work. (*Id.*). Masaba referred him to vestibular therapy. (*Id.*). Masaba's notes further reflect that Oswald complained of anxiety at the internship due to "overstimulation." (*Id.*).

Oswald's medical records also include treatment records from appointments with his internist, Michael S. Myers ("Myers"), MD, at Bay Creek Medical Group from August 1, 2014 (days after his hospital discharge) through August 21, 2015. (Tr. 550-78). As with Dr. Grier, Dr. Myers's notes reflect that Oswald complained throughout the treatment period of headache (sometimes noted as daily and significant), dizziness or vertigo, fatigue, and concentration difficulties. (*Id.*). The records show that Oswald was treated with anticoagulants as a result of the ICA dissection. (*Id.*). Myers monitored Oswald's treatment with specialists. (*See*, *e.g.*, Tr. 553, 557, 568, 572-73, 577). Myers regularly evaluated Oswald for his capacity to return to work, noting in August 2014 that it was "clear he is not able to return to work anytime soon" (Tr. 557) and one year later in August 2015 that Oswald "probably" had reached his "maximum medical improvement," understood he would need to find "nonmanual" work, and should receive a neurological opinion. (Tr. 576, 577).

As indicated above, while Oswald was regularly treating with Grier and Myers, he was also treating with or evaluated by various specialists. His medical records include treatment records from neurologists (Tr. 337-41, 342-50, 465-72), a neurosurgeon (Tr. 335-36), an ophthalmologist (Tr. 327-34), and an occupational therapist (Tr. 357-62). In May 2015, neurologist Patrick J. Hughes ("Hughes"), MD, conducted an independent medical examination pursuant to Oswald's workers' compensation insurance and stated, among other things, that

8

Oswald's "current complaints of headaches and fatigue are stress related, as a consequence of the carotid artery dissection." (Tr. 345). Neurosurgeon Amrendra Miranpuri ("Miranpuri"), MD, evaluated Oswald in August 2015. (Tr. 335-36). He noted Oswald's complaints of headache and reviewed his January 2015 CT angiogram (Tr. 314-15) and July 2015 magnetic resonance angiogram ("MRA") (*id.*). Miranpuri recommended against "neurosurgical intervention" considering "the lack of recanalization of the artery and the lack of ischemic symptoms," but counseled continued monitoring "in case it does recanalize." (Tr. 336). Oswald also treated with neurologist Anthony Maroldo ("Maroldo"), MD, from December 2015 through August 2016. (Tr. 465-67, 470-72). Maroldo's December 2015 treatment notes reflect that Oswald complained of daily painful headaches, frequent dizziness, exhaustion and persistent fatigue, frequent anxiety, and photosensitivity. (Tr. 465-66). The treatment record contains no information or notes under the sections captioned "Impression/Discussion" and "Plan." (Tr. 467). The August treatment notes pertain to an August 16, 2016 appointment and document that his most recent appointment had been on May 23, 2016, although no records of that or other visits between December 2015 and August 2016 appear to be contained in the record. (Tr. 470). Oswald indicated that he was "pretty must status quo" and still continued to suffer from "pretty intense" headaches. (*Id.*). He advised Maroldo that he was working ten hours per week at an internship and wanted to increase his hours, but believed his headaches and photosensitivity would make that difficult. (*Id.*). Maroldo's notes reflect that Oswald's internship, which was six months in duration, was scheduled to end in October 2016. (*Id.*). Maroldo observed:

> Now, more than two years later, [Oswald] continues to experience chronic daily headaches, chronic neck pain, non-specific dizziness, fatigue, insomnia, generalized anxiety, and sensitivity to light. His neurological exam remains normal. . . . I explained again to Mr. Oswald that I do not think that his symptoms are a direct consequence of the internal carotid artery dissection. It may be

9

> that the stress and psychological trauma of this serious health issue
> developing as a consequence of normal work routine is being
> manifest as these physical symptoms. . . . His incremental
> increase in work tolerance since our last visit has been minimal.
> He was hoping to be up to working 20 hours per week by the end
> of this program in October. I have a low expectation that he will
> achieve this.

(Tr. 472). Maroldo made no new diagnostic or management recommendations and left further follow-up "open-ended." (*Id.*).

Finally, Oswald's medical records contain reports of angiograms; the most recent in the record is a report of a CT head neck angiogram performed on March 25, 2016. (Tr. 452-55). The findings were unchanged from the prior exams and "consistent with known dissection." (Tr. 453).

### B. Opinion Evidence

The ALJ addressed the medical opinion evidence in his decision and accorded "little weight" to every medical opinion of record. (Tr. 20-23). Of the nine opinions discussed by the ALJ, he substantially discounted three – those of Dr. Shaheed, Dr. Ling, and Occupational Therapist DeSanctis – on the grounds that they were "vague and d[id] not provide function-by-function analyses of [Oswald's] work-related restrictions; four – those from Dr. Hughes, Dr. Grier, Dr. Masaba and Ms. Sisca – on the grounds that "portions of their assessments are inconsistent with the overall evidence of record, which shows relatively benign physical objective findings"; and three – those of Dr. Maroldo, Dr. Luna, and Dr. Harding – on the grounds that "their opinions are mostly inconsistent with the overall evidence of record, which shows that Mr. Oswald's July 2014 carotid artery dissection and anxiety disorder have caused more than minimal functional limitations in his ability to perform mental-work-related activities." (Tr. 21-22).

10

The seven providers who opined that Oswald suffered from more than minimal limitations[1] indicated the following:

1. On June 2, 2015, Dr. Grier assessed lifting and carrying limitations, occasional limitations with certain postural activities, but noted that he was unable to assess sitting, standing, and walking limitations because Oswald's "carotid problems" still needed to be addressed with "specialist" and "acute headaches, dizziness, and hypotension" "still need[ed] to [be] control[led]" (Tr. 439) and environmental limitations because Oswald was still being evaluated for "unstable B/P" (Tr. 443).

2. On October 17, 2016, Dr. Masaba provided an opinion, indicating that Oswald suffered from daily headaches, ranging in intensity from 4/10 to 8/10, that affect his concentration and mood; daily dizziness aggravated by side-to-side head rotation, such as when performing computer work; daily photosensitivity; stress tolerance difficulties; and, fatigue resulting in "limited ability to maintain focus." (Tr. 432-33). According to Masaba, "[t]hese symptoms all occur on a daily basis, with various degrees of severity . . . and full time work is beyond his capacity at this period." (Tr. 433).

3. On May 8, 2015, examining neurologist Dr. Hughes opined that Oswald suffered from stress-related headaches and fatigue "as a consequence of the carotid artery dissection" and that it would be "appropriate" for him to participate in a work hardening program for a month and "hopefully, he would be able to return to normal activities after that." (Tr. 345-36). He also opined that Oswald had not reached maximum medical improvement. (Tr. 346).

4. Physician Assistant Brianne Sisca periodically evaluated Oswald under the supervision of Dr. Grier and noted continuing symptoms of headache and vision issues that cause impairments; she also indicated that a maximum weight restriction of thirty pounds would be appropriate. (Tr. 517-18, 523-24, 527-29, 532-34).

5. On July 24, 2014 (approximately one week after the dissection), neurologist Dr. Shaheed opined in a brief letter

---

[1] As the parties do not dispute the ALJ's determination to give little weight to the opinions of Drs. Maroldo, Luna and Harding, I do not address them herein.

> that "[t]he pattern of [Oswald's] injury and underlying tear in the artery indicative of an extreme neck movement related to the hammering which compromised the structural integrity of the arterial wall." (Tr. 398). Noting the "severity of his illness," Dr. Shaheed "highly recommended to avoid above tasks in order to minimize neck movement and subsequent trauma." (*Id.*).
>
> 6. On August 31, 2015, Carolyn Ling ("Ling"), MD, performed a consultative internal medicine examination. (Tr. 426-29). She diagnosed Oswald with "[l]eft carotid artery dissection with complete occlusion of the left carotid artery with documentation of collateral flow of the left-sided arteries of his head with persistent headache." (Tr. 428). Dr. Ling opined that Oswald "has marked limitation to activities of daily living secondary to his chronic headache . . . [and] marked limitation to carrying and heaving lifting secondary to his persistent carotid artery dissection." (Tr. 429).
>
> 7. Occupational Therapist Emily DeSanctis ("DeSanctis"), MS OTR/L, assessed that Oswald had difficulty coping with stress, mild executive functioning deficits, and possible visual perceptual deficits. (Tr. 361). She indicated "stress and fatigue" would be "the most difficult to deal with during his work day" and recommended occupational therapy to address "cognition, stress management, and endurance." (*Id.*).

C. **Oswald's RFC Challenge**

Oswald does not concede that the ALJ was correct in substantially discounting all of the opinion evidence of record, but he does not explicitly seek reversal of the ALJ's decision on the grounds that he improperly weighed any or all of that evidence. Rather, his challenge is narrower: that by according little weight to every opinion of record, the ALJ was left with no basis – other than his own lay conjecture – on which to formulate his RFC assessment. The ALJ's two articulated bases, namely, Oswald's "relatively benign objective findings and his own reported activities," Oswald continues, do not constitute substantial evidence to support the ALJ's RFC determination. I agree.

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted by*, 2010 WL 4703591 (W.D.N.Y. 2010). Accordingly, although the RFC determination is an issue reserved for the Commissioner, "'[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities,' as a general rule, the Commissioner 'may not make the connection himself.'" *Nanartowich v. Comm'r of Soc. Sec.*, 2018 WL 2227862, *9 (W.D.N.Y. 2018) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)). Although under certain circumstances, particularly where the medical evidence shows relatively minor physical impairment, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment," *House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y. 2013) (internal quotation omitted), those circumstances are not present here.

Oswald's challenge to the ALJ's RFC assessment centers on his determination that Oswald can satisfy the requirements of light work (with certain lifting, carrying, postural and environment limitations, which are not at issue). Because the ALJ substantially discounted or rejected all the opinion evidence of record, there is no competent medical opinion that supports his finding that Oswald can perform light work. The record demonstrates that Oswald suffered a serious dissection of his left carotid artery at work, likely as a result of extreme neck movement associated with hammering. He was hospitalized for approximately one week, taken out of work, and received regular and ongoing treatment from neurological specialists, internists and physiatrists, ophthalmologists, and occupational therapists. Oswald underwent various imaging

13

studies, including CT angiograms and MRAs, which consistently demonstrated left carotid artery dissection with occlusion of the artery and reconstitution along the petrous portion of the internal carotid artery. As his treatment records reveal, he began to suffer significant symptoms immediately following the dissection, most of which persisted during the relevant period. For example, Oswald experienced and was referred to a neurologist for daily headache that was often intense in pain. In addition, he experienced chronic fatigue, which he sometimes described as exhaustion, and noted he resorted to daily midday naps. As several treatment providers noted, those symptoms of headache and fatigue were exacerbated by his diagnosed anxiety and stress. (*See*, *e.g.*, Tr. 311, 360). He also suffered from dizziness and vertigo that also persisted during the relevant period, and photosensitivity.

In consultation with his treatment providers, Oswald engaged in efforts to facilitate his return to work. After he was eventually cleared to do so, he began a work hardening program in June 2015, nearly one year after his injury. His participation in the program was put on hold after four days due to headache and fatigue and concerns that he was not improving. Approximately one year later, he began a part-time internship with a not-for-profit organization (Tr. 36), but was unable to achieve the stated goal of working 20 hours a week; instead, he worked somewhere between ten and fifteen hours a week by the end of the internship (Tr. 37, 47). Importantly, his neurologist also noted that he experienced dizziness turning his head while working at a computer, and referred him to vestibular therapy.

In sum, although the treatment records reflect that Oswald made some "slow[] recover[y]" following the July event (Tr. 563), his internist opined that he probably had reached his maximum medical improvement by the time he participated in his internship (Tr. 576). At

that time, he was still suffering from persistent headaches and fatigue, made worse by stress, as well as dizziness or vertigo apparently associated with work activity.

The ALJ's reasons for finding that Oswald could satisfy the demands of light work do not amount to substantial evidence, especially in the absence of any competent medical opinion to that effect. First, the ALJ concluded that, "despite taking daily prescription medications such as Tylenol with codeine and atorvastatin and seeking regular medical treatment after his injury, Mr. Oswald had relatively benign physical examination findings." (Tr. 20). The ALJ also observed that "[t]he objective findings of record are inconsistent with a level of severity that would preclude [Oswald] from sustaining any work activity." (*Id.*). As an initial matter, the objective findings include many imaging studies that demonstrate carotid artery dissection – a plainly serious condition as evidenced by his immediate hospitalization and ongoing evaluation, monitoring and treatment by a variety of doctors and specialists over an extended period of time thereafter. Second, although Oswald did have many normal physical examination findings, they were not uniformly so. Treatment providers often noted abnormalities with his eyes and tongue. Moreover, the benign examination findings noted by the ALJ – intact coordination, 5/5 upper and lower extremity strength, intact extremity sensations, normal gait and ability to ambulate without an assistive device, get on and off an examination table, squat, rise from a chair with no difficulties (Tr. 21) – bear little, if any, relationship to his headache and fatigue, two of the symptoms that caused him the most significant problems.

Nor does the ALJ's reliance on Oswald's reported daily activities provide substantial evidence for his determination that Oswald could perform light work. The record indicates that some of the activities noted, such as, cooking, cleaning, laundry, and shopping, were activities that Oswald engaged in once or twice a week (*see* Tr. 427) and hardly address the

15

more fundamental question of whether Oswald's fatigue, dizziness, and headaches would limit his ability to do any activities on a full-time basis, *see Wilson v. Colvin*, 213 F. Supp. 3d 478, 488 (W.D.N.Y. 2016) ("a claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a [light work] job"), let alone standing and walking for six hours out of an eight-hour workday. *See Michaels v. Colvin*, 621 F. App'x 35, 40 (2d Cir. 2015) (light work requires "a good deal of walking or standing . . . for a total of approximately 6 hours of an 8-hour workday") (quoting 20 C.F.R. § 404.1567(b)). Oswald's daily activities are far less probative of his work-related limitations than his performance in the work hardening program and part-time internship, which fell short of his goals. *See*, *e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . [,] and is not held to a minimum standard of performance, as she would be by an employer").

Under these circumstances, I conclude that the ALJ's RFC assessment is not supported by substantial evidence. *See Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) ("[w]hen an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion, . . . and she is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record") (internal quotations and citations omitted); *House v. Astrue*, 2013 WL 422058 at *4 ("[b]ecause there is no medical source opinion supporting the ALJ's finding that [plaintiff] can perform sedentary work, the court concludes that the ALJ's RFC determination is without substantial support in the record and remand for further

16

administrative proceedings is appropriate"); *Dailey v. Astrue*, 2010 WL 4703599 at *11 ("[w]ithout this additional medical evidence[,] [the ALJ], as a layperson, could not bridge the gap between plaintiff's [impairments] and the functional limitations that flow from these impairments"); *Walker v. Astrue*, 2010 WL 2629832, *7 (W.D.N.Y.) (same), *report and recommendation adopted by*, 2010 WL 2629821 (W.D.N.Y. 2010); *Lawton v. Astrue*, 2009 WL 2867905, *16 (N.D.N.Y. 2009) ("[t]he record in this [case] contains no assessment from a treating source quantifying plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination"); *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d at 913 ("remand is necessary to obtain a proper medical source opinion to support the ALJ's residual functional capacity finding").

"As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . , to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing."[2] *See Gross v. Astrue*, 2014 WL 1806779, *19 (W.D.N.Y. 2014) (quoting *Deskin*, 605 F. Supp. 2d at 912). Remand is appropriate for the ALJ to do so here.

### D. Oswald's Step Five Challenge

In light of my determination that remand is warranted, I decline to address Oswald's remaining challenge to the ALJ's step five determination. *See*, *e.g.*, *Benman v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 252, 260-61 (W.D.N.Y. 2018); *see also Stein v. Colvin*, 2016 WL 7334760, *3 n.2 (W.D.N.Y. 2016) (remanding where RFC determination was not

---

[2] Indeed, the ALJ discounted several opinions from treating providers and consultative examiners on the grounds that they were vague and did not provide function-by-function analyses of Oswald's work-related restrictions. Had they been recontacted, they might have been able to clarify their opinions and provide the desired functional analyses.

supported by substantial evidence because ALJ based RFC on raw medical evidence and his own lay opinion; "[plaintiff] advances other arguments that she believes require reversal of the Commissioner's decision[;] [h]owever, because this [c]ourt disposes of this matter on the improper RFC determination, those arguments need not be reached").

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Oswald's motion for judgment on the pleadings **(Docket # 8)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

                                            *s/Marian W. Payson*
                                            MARIAN W. PAYSON
                                          United States Magistrate Judge

Dated:  Rochester, New York
          June 26, 2019.